OPINION OF THE COURT
Jeffry H. Gallet, J.
The father having withdrawn his application for custody of the child, the only matter before me at this time is the father’s application for extensive, overnight visitation with the child, which application is supported by the Law Guardian. The mother opposes any overnight visitation with the father and moves for an order of supervised visitation, away from the father’s home.
This matter was hotly contested with 14 witnesses testifying over more than 40 trial days and more than 80 exhibits offered in evidence.
THE LAW — VISITATION
At the crux of this case is the mother’s allegation that the father sexually abused his child. Clearly, if she is able to sustain that allegation, visitation can be suspended or severely limited. (Nacson v Nacson, 166 AD2d 510 [2d Dept 1990]; see also, De La Torre v De La Torre, 183 AD2d 744 [2d Dept 1992]; B. v B., 184 AD2d 609 [2d Dept 1992]; Schlessel v Schlessel, 75 AD2d 869 [2d Dept 1980].)
Where a particular circumstance exists making unsupervised visitation undesirable, supervised visitation has been held not to be a deprivation of meaningful access to the child by the noncustodial parent. (Lightbourne v Lightbourne, 179 AD2d 562 [1st Dept 1992].) However, where a special circumstance does not exist, and there is hostility between the parents, it is required that meaningful visitation be away from the custodial parent. (Matter of Schack v Schack, 98 AD2d 802 [2d Dept 1983].)
EVIDENCE — BEHAVIORAL AND PSYCHOLOGICAL
No physical evidence of sexual abuse was offered nor did the child, who is four years old, testify. All of the evidence concerning sexual abuse came from hearsay recitations of the child’s statements, descriptions of her behavior and expert testimony. Indeed, four experts, two psychologists and two social workers, testified. Before considering that testimony, it *976 is crucial that the evidentiary framework in which it is to be considered be established.
"Child abuse is one of the most difficult crimes to detect and prosecute, in large part because there often are no witnesses except the victim.” (Pennsylvania v Ritchie, 480 US 39, 60 [1987].) Many child sexual abuse cases involve children who cannot be sworn as witnesses. They are either too young to understand what it is to testify under oath, or lack the ability to recall, report or evaluate the events in question. There is an unusually high incidence of expert testimony in these cases. New York, like most jurisdictions, recognizes a hearsay exception for a child’s out-of-court report of sexual abuse, but requires corroboration of the child’s statements. (Family Ct Act § 1046 [a] [vi].) That exception, which normally applies only to child protective proceedings, is applicable to sexual abuse allegations made in custody cases. (Matter of Le Favour v Koch, 124 AD2d 903 [3d Dept 1986], lv denied 69 NY2d 605 [1987]; Matter of Albert G. v Denise B., 181 AD2d 732 [2d Dept 1992].) However, a child’s hearsay statement of sexual abuse must be corroborated. (Matter of Nicole V., 71 NY2d 112 [1987].) In this case only behavioral evidence was offered to corroborate the child’s out-of-court, unsworn statements.
It must be noted that behavioral evidence, albeit not tangible, is no less real than physical evidence. It is subject to the same criteria for admission as physical evidence. For example, a proper diagnosis of mental illness is equal in evidentiary weight to a proper diagnosis of physical illness or injury.
To illustrate, if a four-year-old child appears in a hospital emergency room with a slash wound on her shoulder and she tells the emergency room physician that her father cut her with a razor, the physician may testify to the child’s statement and that the wound was consistent with a razor cut. Similarly, if a child tells a mental health expert that she was sexually abused by her father, and the expert diagnoses her as suffering from a recognized mental disease which could be caused by trauma, the mental health expert may testify to the statement, to the diagnosis, and also that the mental illness was consistent with sexual abuse.
In neither example would the expert witness be able to confirm the father’s culpability. In both examples the expert opinion would buttress the child’s statement. It would prove that something had happened to the child, since both the slash wound and the mental disorder were caused by trauma of some sort.
*977 Less conclusive evidence of physical or behavioral injury would also be admissible. In the case of the slash wound, the court would accept an opinion based on the witnesses’ observations of scarring, residual pain, restricted arm movement and other less conclusive evidence of a slash wound. Likewise, less than perfect evidence is acceptable as behavioral testimony in child sexual abuse cases, with the fact that it is less than conclusive affecting its weight rather than its admissibility.
EVIDENCE — VALIDATION
The most common type of expert testimony received in child sexual abuse cases is what is known as validation testimony. That term, although now generally accepted, is misleading. The "validator” validates nothing. Validation testimony is no more than expert psychiatric or psychological evidence of a child’s mental illness or unusual behavioral manifestation, which would be consistent with sexual abuse. It would be error to treat it otherwise. In fact, were it not for the possibility of confusion with the old "corroboration” requirement in rape cases, it would be far more accurate for the court’s purposes to refer to these witnesses as corroborators rather than validators, because the latter term implies approval of the genuineness of the child’s claim, not merely recognition of consistency with a certain behavioral pattern.
While, in a treatment context, a validator is required to make a determination whether he or she believes the allegations, the determination is made based upon objective observations measured against concrete guidelines; the purpose of the validation process is to aid in clinical decisions for the purpose of intervention and therapy. The validator as witness does not give a personal opinion as to whether the abuse occurred. This witness relates the behavioral indicators observed in the child to those recognized as displayed by children who have been sexually abused. It is for the Judge to decide whether the abuse occurred.
EVALUATING EXPERT TESTIMONY
In this case, I heard two psychologists, Dr. April Kuchuk and Dr. Sylvan Schaffer, and two social workers, Ms. Harriet Plaskow and Ms. Barbara Pichler. The threshold issue is how to weigh the evidence they presented, since these experts disagreed.
Determining what weight to assign to expert testimony in *978 child sexual abuse cases is frequently more difficult than the issue of qualifying witnesses. Certainly, the opinion of a psychologist as to the interpretation and administration of standardized tests would have more weight than that of a psychiatrist. Conversely, a psychiatrist’s opinion as to psychotropic medication would carry more weight than that of a psychologist. Beyond the obvious, we must analyze what opinion is being elicited from whom.
In addressing child sexual abuse issues, where often there is not a generally accepted diagnosis, the problem of evaluating expert testimony is increased. Essentially, all expert opinions are based on clinical experience, experimental data, or epidemiological data, or some combination of them.
The clinical method is a relatively thorough examination of a small number of patients, often seen in treatment or for evaluation after a referral for treatment, and the subsequent extrapolation of general principles. For instance, a therapist who is treating several sexually abused five-year-old girls, all of whom masturbate, might form a hypothesis that masturbation is an indication of sexual abuse in young girls. While the clinical approach is sometimes helpful in making treatment decisions, in most cases it is not sufficiently reliable to form the basis of an expert’s opinion.
A primary problem with the clinical method is subject selection bias. If the subjects choose themselves, as when patients choose to visit a psychotherapist (or, in the case of young children, are brought by their parents), the subject base becomes limited to those with the motivation and financial ability to obtain psychotherapy. In addition, the subject pool is influenced by the way a particular therapist receives patient referrals. In the above example, we cannot conclude that there is an association between masturbation and sexual abuse because we have no data on the incidence of masturbation in five-year-old girls generally. (As it happens, it is quite common.) If the same number of five-year-old girls masturbate, sexually abused or not, we cannot assume that it is an indication of sexual abuse.
A further problem is that other factors which might influence a conclusion are not controlled by one using the clinical method, but may be responsible for the behavioral manifestation observed. For instance, it might make a difference if all of the five year olds came from single parent homes. One might just as well draw a conclusion that masturbation is caused by *979 divorce. Without the ability to control, or at least account for, variables, the results are in question.
The "clinical method” should not be confused with a clinical evaluation. A clinical evaluation consists of an integration of accepted knowledge and principles with individual data by a trained professional to form a conclusion. Skillfully done, it is an important part of a truth-finding process.
The epidemiological method examines large numbers of subjects of various backgrounds with a focus on specific factors, with a view to finding associations among the factors. For example, one might find that most cases of lead poisoning in children in the last 12 months involved children from poor neighborhoods. One could then make inferences about the meaning of that association; perhaps, for example, poor housing maintenance.
The experimental method is generally considered the most reliable source of information. A researcher specifies a particular hypothesis in advance; he or she then selects a group of subjects upon whom to test that hypothesis, with all possible variables being held constant. For example, one could test the hypothesis that juvenile delinquents are slow learners, and, therefore, repeat their mistakes. To test the hypothesis, the same task would be taught to two groups, one consisting of juvenile offenders, and the other a control group from the general population; the two groups would be matched for age, education, IQ, sex and social class. The researcher would then statistically compare how long it took the members of each group to learn the task. An important characteristic of the experimental method is that another researcher performing the same experiment under the same conditions would get the same results.
THE EXPERTS
Courts have received opinions from various witnesses in sexual abuse cases. In addition to the obvious experts, board-certified psychiatrists and doctorate-level psychologists, others have been permitted to give expert opinions of varying degrees in child abuse cases. Courts have received testimony from social workers with Master’s degrees (Matter of Nicole V, 71 NY2d 112 [1987], supra; State v Spigarolo, 210 Conn 359, 556 A2d 112 [1989], cert denied sub nom. Spigarolo v Connecticut, 493 US 933 [1989]; Wheat v State, 527 A2d 269 [Del Sup Ct 1987]), schoolteachers (Matter of Tantalyn TT., *980 115 AD2d 799 [3d Dept 1985]), psychologists with Master’s degrees (State v McCoy, 400 NW2d 807 [Minn App 1987]; Commonwealth of Pennsylvania v Pearsall, 368 Pa Super 327, 534 A2d 106 [1987], appeal denied 524 Pa 596, 568 A2d 1246 [1989], overruled by Commwealth of Pennsylvania v Garcia, 403 Pa Super 280, 588 A 2d 951 [1991]), art therapists (Matter of Beverly WW., 159 AD2d 802 [3d Dept 1990]), nurses (Matter of Rose B., 79 AD2d 1044 [3d Dept 1981]), nurse practitioners (Matter of Sheikara G., 163 AD2d 69 [1st Dept 1990]), speech therapists (Matter of Anita U., 185 AD2d 378 [3d Dept 1992]), and even a grandmother (Matter of Shaune L., 150 AD2d 689 [2d Dept 1989]). The opinions received were, in many cases, less conclusive than would be admissible from a validator, but they were received with other evidence to support findings of sexual abuse.
Dr. April Kuchuk and Dr. Sylvan Schaffer are psychologists. Each has outstanding credentials. The definition of the word "psychologist” varies from State to State. In New York State, one may not use the title "psychologist” unless licensed by the State. (Education Law § 7601.) In order to receive a psychologist license, one must have a doctorate in psychology from an approved institution of higher education, two years of supervised employment as a psychologist or engagement in "appropriate psychology activities,” and must pass an examination. (Education Law §§ 7603, 7603 [3].) A person licensed under such exacting conditions will generally be permitted to opine in all areas of general psychology. However, child sex abuse is a new and emerging field and is highly specialized. Most courts also require additional expertise before admitting validation testimony.
Dr. Schaffer did not give validation testimony or render opinions on the subject of sexual abuse. Dr. Kuchuk, who was appointed by the court as a neutral validator in this case, did give validation testimony. In addition to being a New York State licensed psychologist, Dr. Kuchuk is a professor in the graduate psychology programs at the City University of New York and New York University. She is also a clinical instructor at the New York University School of Medicine. She has published articles, two of which appeared in a child abuse source book published by the Appellate Division, First Department. She also has extensive experience in clinical psychology and child sexual abuse validations. Of the three witnesses who gave expert testimony on sexual abuse issues, Dr. Kuchuk had the most formal education, the most knowledge of the litera *981 ture in the sexual abuse area, and was the only one who had an extensive opportunity to see the child interact with both parents and to interview both parents on sexual abuse issues.
Dr. Kuchuk has been qualified as an expert in child sexual abuse in numerous court proceedings and particularly in Matter of E.M. (137 Misc 2d 197 [Fam Ct, NY County 1987]), the leading case in this jurisdiction on the subject of appropriate methodology in child abuse validations. (In another published opinion, Matter of Glenn G., 154 Misc 2d 677 [Fam Ct, Kings County 1992], the court based its findings that a child was sexually abused substantially on Dr. Kuchuk’s expert testimony.)
Her opinions in this case were based on experimental data in the sexual abuse area, of which she appeared to have encyclopedic knowledge, and her evaluation of the parties. Dr. Kuchuk saw the mother alone twice, the father alone twice, the child alone three times, the child with the mother at the mother’s home once, the child with the father once in her office and once at the father’s home, and the child’s babysitter. She had telephone contact with the father’s therapists, the child’s therapist and the Law Guardian. She read documents supplied to her by counsel for each of the parents and the child’s therapist’s notes and she heard a tape recording of the child making sexual abuse allegations to the babysitter. She also administered various psychological tests.
I gave more weight to Dr. Kuchuk’s testimony than to any of the other expert witnesses. She was a court-appointed neutral who withstood an exhaustive cross-examination. She was the most knowledgeable of the experts and she had the most comprehensive data with which to work.
Social workers, even those certified by New York State, present a more difficult problem. A certified social worker may not be qualified as a mental health expert based on his or her certification alone, because the certification process does not require a significant amount of training or expertise in human behavior of psychotherapy. New York certifies as social workers people engaged "in social case work, social group work, community organization, administration of a social work program, social work education, social work research, or any combination of these in accordance with social work principles and methods.” (Education Law § 7701.) It defines social work as "helping individuals, families, groups and communities to prevent or to resolve problems caused by social or emotional *982 stress.” (Id.) There is no experience required and a Master’s degree in social work and a written examination are, essentially, the only requirements for certification. (Id.)
Some social workers have sufficient specialized training to allow them to be qualified as experts for testimony on mental health issues. Indeed, clinical social workers are a core mental health discipline. Their particular expertise is dealing with the relationship between social and emotional functioning, as well as with social policy and environmental intervention. With appropriate experience and credentials, they can be qualified to give mental health opinions. (People v Gans, 119 Misc 2d 843 [Sup Ct, NY County 1983].) Social workers with appropriate credentials have been qualified as validators in several leading cases (Matter of Nicole V., supra; State v Spigarolo, supra; Wheat v State, supra; State v Reser, 244 Kan 306, 767 P2d 1277 [1989]), but that qualification is far from automatic. (See, State v Goodwin, 320 NC 147, 357 SE2d 639 [1987], witness qualified as an expert to certify as to common patterns of behavior resulting from child sexual abuse, which disagreed with State v J.Q., 252 NJ Super 11, 599 A2d 172 [1991], where a clinical social worker was not qualified as an expert on posttraumatic stress disorder.)
Harriet Plaskow, a certified social worker, who did an "assessment” of the child, has significant experience in child sexual abuse and the issues surrounding it. Her assessment, which did not include any contact with the father, led her to the conclusion that sexual abuse was possible and she recommended, in essence, that a full validation, by a qualified professional, be done.
I took expert testimony from Barbara Pichler, a certified social worker, who was the child’s psychotherapist. Ms. Pichler has considerable clinical experience as a psychotherapist for both children and adults. She has limited experience in the area of child sexual abuse and appeared to be unfamiliar with the extensive and specialized literature in this field. It is important to note that she relied almost entirely on the clinical method, the least reliable of the three bases for expert opinions, for her conclusions.
It is significant that a good deal of the information she considered to be important indicators of sexual abuse were discounted by Dr. Kuchuk based on current literature in the field. Ms. Pichler, who has a psychoanalytical orientation, gave considerable weight to symbolism and the child’s play *983 with certain dolls, including a bear with a long nose, which nose she saw as a phallic symbol. Ms. Pichler’s qualification to draw such conclusions are questionable, particularly in light of the evidence I received that interpretation of doll play, even when made by experts using anatomically detailed dolls and accepted protocols, is of questionable value. Indeed, the State of California does not permit such evidence at all. (Matter of Amber B., 191 Cal App 3d 682, 236 Cal Rptr 623 [1987]; Matter of Christie D., 206 Cal App 3d 469, 253 Cal Rptr 619 [1988].)
It is Ms. Pichler who is responsible, in great part, for the mother’s belief that the child was sexually abused by her father. One cannot escape the conclusion that subsequent events have caused her to become rigid in her opinion that sexual abuse occurred, even in the face of considerable evidence to the contrary.
Dr. Schaffer is a well-qualified psychologist who opined primarily that Dr. Kuchuk’s diagnosis of the mother was incorrect. Since custody is not at issue, I attributed little weight to Dr. Kuchuk’s opinion as to the mother’s diagnosis in coming to my conclusions in this case, likewise, I gave Dr. Schaffer’s opinion little weight.
FACTS
Although there is a difference in perception as to most of the events before me, there is less of a factual difference than the parties might at first lead one to believe. These parents have fallen into that all too familiar pattern in matrimonial cases of provoking each other to the point of irrationality. The father, particularly, is able to get under the mother’s skin, and he does not hesitate to do so. Watching him testify, and hearing testimony about his behavior, I have no doubt that the father is cold and arrogant to the point of being obnoxious. He was irritating, even during his direct examination. The mother, who I find to be legitimately concerned about the welfare of her child, easily rises to his bait. Both parties acted in ways one would have hoped they had not. I do not intend to go into that behavior in detail except to note that under the strain to which these parties and their daughter have been subjected, such behavior while not desirable, is understandable.
This child was born on June 15, 1989 into a marriage which even then showed signs of stress. Both parents were either employed or seeking employment. In July of 1990, they hired *984 Ingrid Mitchell as the child’s babysitter. Ms. Mitchell has been an important figure in the child’s life and presently cares for her.
Relatively early in her employment, Ms. Mitchell, while cleaning the child, noted that she thought the child’s vaginal opening was unusually large. Apparently, although she did not discuss this matter with the mother, she displayed the child’s vagina to certain other women and asked them if they thought it was unusual. Ultimately, because of the allegations before me, the child was examined by pediatricians at New York Hospital. Her vaginal opening was not found to be remarkable nor, in fact, was any physical evidence of child sexual abuse found.
By June of 1992, the household had become, at least, somewhat dysfunctional. The marriage was clearly in trouble. The atmosphere in the family’s relatively small apartment had become tense. There is every reason to believe that the child felt this tension. At the end of September, the mother left on a business trip. She returned early after the babysitter told her that the father was entertaining a woman in the family apartment. The mother testified that when she entered the apartment she found the father in the living room with the woman and the child in the next room asleep, in soiled clothing.
On October 13, the father moved out of the marital apartment without notice or explanation to his family. He took his belongings, including pictures that were hanging on the walls and other similar items. When the mother and child returned home that day, they discovered that he had moved out.
On October 30, while the babysitter was cleaning her after she used the toilet, the child complained that her father had given her a "rash.” An examination of the child’s vagina and legs showed no irritation. The child continued saying that her father had given her a rash and a "boo-boo,” and that he had put cream on it. (The child had a history of rashes which had been, indeed, treated with cream.) The babysitter called the mother at work. She sent home a tape recorder with instructions to the babysitter to try to get the child to repeat the allegations. The mother did not return home at that time.
It is not clear to me exactly what happened once the tape recorder arrived. A tape was made and played for both Ms. Pichler and Dr. Kuchuk, but never introduced into evidence.
There is no question that the child suffers from an emo *985 tional illness. Ms. Pichler diagnosed the child as having a posttraumatic stress disorder; Dr. Kuchuk diagnosed her as having an adjustment disorder with anxious mood functional enuresis and a severe psychosocial stressor.
During this period Ms. Pichler, who is mandated to report suspicions of child abuse as part of her duties as a certified social worker, began to suspect that the child may have been sexually abused. She made a report to the State’s child abuse central registry.
On November 4, 1992, Ms. Pichler invited the parents to meet with her to discuss the sexual abuse issue. Apparently, the mother concentrated her participation to issues regarding the marital breakdown. The father was, essentially, unresponsive. The parents did discuss with Ms. Pichler that they had not explained to the child why the father moved out. Ms. Pichler thought that that fact could have been a significant stressor on the child and she advised them to speak to the child about the father’s absence from the residence.
As a result of Ms. Pichler’s report of suspected child abuse, the Child Welfare Administration referred the child to Ms. Plaskow to assess whether commencing a child protective proceeding would be appropriate. On November 1, the child’s first meeting with Ms. Plaskow took place. The mother was present throughout the entire session. Ms. Plaskow talked to the child about good and bad touches, and demonstrated with puppets and other toys. The child did not repeat her allegations.
On November 17, the child had her second session with Ms. Plaskow. Both the mother and the babysitter were present. Ms. Plaskow was more direct at this session, discussing the issues of the case with the child. The child denied that the father had touched her. As a result, Ms. Plaskow’s assessment was that if the child had been abused, she was not willing to talk about it. She suggested monitoring the child’s play.
On December 7, the child had her third meeting with Ms. Plaskow. The babysitter was there for the entire interview. At that interview, in response to a direct question from Ms. Plaskow, the child said, "Dad touched me on the tussic [sic], again, I don’t like that.” The child demonstrated by squeezing her crotch, and reported that the babysitter had been outside the room when this event occurred.
Ms. Plaskow never interviewed the child away from the mother and the babysitter. Nor did she speak to the father. *986 Based on her three sessions with the child and information she received from the babysitter and the mother, Ms. Plaskow recommended supervised visitation and therapy for the child and her father, as well as a further investigation.
From October 30, all of the child’s visits with her father had been supervised. To date, all visits either have been supervised or have taken place in public areas. It would seem that the supervised visits and ensuing restrictions cause friction and difficulty among the mother, the father and the child.
Throughout the period from October 30 until the commencement of trial, the child told numerous people several versions of the "rash,” "boo-boo” story. She always received the sympathetic attention from her listeners. Her accusations expanded to include other people hitting her and giving her rashes. On January 17, she included Ms. Pichler.
On January 20, 1993, Dr. Kuchuk, the court-appointed validator, held her first meeting with the father. On January 21, she held her first meeting with the mother.
Having heard Dr. Kuchuk’s opinion that this child does not present classic signs of sexually abused children her age, the extensive direct and cross-examination of Ms. Pichler, as well as the mother, the father, the babysitter and various other witnesses, I do not believe that this father sexually abused his daughter. That is not to say that I believe that the mother, the babysitter or any of the other witnesses testified perjuriously or in bad faith.
I believe that the child told the babysitter that her father had given her a rash. I believe that the child was unintentionally encouraged to repeat and elaborate on that story. I have no doubt that the mother, the babysitter and Ms. Pichler believed that abuse had actually occurred. The mother acted appropriately in protecting her daughter from a perceived abuser, particularly after two social workers informed her that they believed the child may have been abused.
DECISION
It is not in the interest of this child to perpetuate an uncomfortable visitation arrangement. However, children, unlike adults, do not respond instantly to court orders. A transitional arrangement must be implemented.
Dr. Kuchuk recommended psychotherapy for the child and both parents. The parents have agreed on Libbe Hurvitz Madson, CSW, as the new therapist for the child. They are *987 each directed to cooperate with that therapist and attend any meetings, conferences or therapy sessions required to implement effective therapy for the child. The father has voluntarily commenced a course of therapy, both group and individual. This court would hope that he continues with his therapy.
Dr. Kuchuk also recommended psychotherapy for the mother. From her testimony, it seems that the mother believes there is a pejorative connotation to this suggestion. That is unfortunate, but not unusual in a society which still attaches a pejorative connotation to psychotherapy. Short-term psychotherapy for a person who has been through the type of emotional trauma this mother has experienced is both appropriate and desirable. She would certainly not hesitate to get physical therapy to correct physical trauma but is reluctant to engage in psychotherapy.
Although this court may direct a parent to engage in psychotherapy (Matter of James U., 125 AD2d 921 [3d Dept 1986]), I am reluctant to do it in this case, particularly in light of Dr. Schaffer’s testimony. I question the efficiency of such therapy with an unwilling patient. I would hope, however, that the mother would engage in short-term psychotherapy. It is in her own best interest and in the best interest of this child.