Matter of Mackenzie FF. (2004 NY Slip Op 50304(U))

[*1]

Matter of Mackenzie FF.

2004 NY Slip Op 50304(U)

Decided on March 9, 2004

Family Court, Fulton County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 9, 2004

Family Court, Fulton County
In the Matter of MACKENZIE FF., A Child under Eighteen Years of Age 
 Alleged to be Abused by Robert FF., Respondent.
Docket No. NA-01349-03

Edward Skoda, Esq.
Attorney for Dept. of Social Services
P. O. Box 549
Johnstown, NY 12095
William Mycek, Esq
Attorney for Robert FF.
146 Market Street
Amsterdam, NY 12010
Brett Preston, Esq.
Law Guardian
P. O. Box 1119
Broadalbin, NY 12025
Russell Martin, Esq.
Attorney for Lisa FF.
11 Church Street
Gloversville, NY 12078

DAVID F. JUNG, J.
Four causes of action, to wit: abuse, neglect, severe abuse and repeated abuse are alleged
by the Department of Social Services against the respondent, Robert "FF". Family Court Act
Section 1012(e) (iii) and Penal Law Sections 130.05, 130.52 and 130.55 are cited with regard to
the abuse charges and Family Court Act Section 1012(f) (I) (B) is cited with regard to the one
[*2]
cause of action alleging neglect. All causes of action are "upon information and belief gathered
from interviews with, and reports from, the New York State Police, Lisa "FF" and upon further
investigation." All causes of action cite four specific events occurring during June 2003 through
July of 2003 at 24 East Main St., St. Johnsville, New York and accused the respondent of :
1. ..."fondling said child genitals..."
2. ..."biting said child's penis causing the child pain..."
3. ..."placing respondent's fingers in said child's rectum causing said child pain..."
4. ..."by (respondent) masturbating himself in the presence of said
child, resulting in respondent's ejaculation..."
Petitioner, respondent and the child, Mackenzie "FF", were represented by counsel; and
the child's mother, Lisa "FF", was represented by counsel as well. Although the District
Attorney of Fulton County was noticed and made a party to the proceeding pursuant to Section
254 (b) of the Family Court Act, there was no appearance nor participation by the District
Attorney.
Trial was held on January 8th and 9th, February 11th, and February 24th, 2004.
The Court took judicial notice of all prior proceedings involving the subject child and his
parents in Fulton County Family Court.
FINDINGS OF FACTS
Mackenzie "FF"was born August 16, 1999 to Lisa "FF" and Robert "FF". Lisa
and Robert "FF" were married June 6, 1998 and physically separated in November 2000. Until
the separation, the parents and child resided in an upstairs apartment at 24 East Main St., St.
Johnsville, New York. Said premises was owned by respondent, having been purchased by him
prior to the marriage. Upon separating, the mother and child remained in the upstairs apartment
[*3]
and respondent moved to an apartment directly below in the same building. An Action for
Divorce was commenced in Montgomery County by Lisa "FF" on November 21, 2000 with a
resultant Judgment of Divorce, upon stipulation by the parties, dated December 7, 2001 and
entered December 21, 2001. Among the salient terms agreed to, Lisa "FF" was granted
exclusive use and occupancy of the second floor apartment, rent free, until March 31, 2004 or
sooner should she choose to vacate or if she "cohabits with another unrelated adult male for
thirty (30) consecutive days". Joint custody was agreed to with Lisa "FF" having primary
physical custody and the father having custodial time Monday, Wednesday, and Friday from 6
p.m. through 8 p.m. and alternate Saturdays from 6 p.m. through 12 p.m., together with certain
holidays to be shared and vacation time of the father's when Mackenzie was to be with him.
Respondent petitioned Montgomery County Supreme Court for additional custodial time with
Mackenzie in February 2002 and by Order of that court dated April 29, 2002 was granted same.
Significantly, in October 2002 the mother's boyfriend, Jerry "P", moved in with her
and Mackenzie in the apartment directly above respondent. Shortly thereafter in October
2002, Mackenzie reported to respondent that Jerry "P" had spanked him. On November 3,
2002, Lisa "FF" and Jerry "P" found that Mr. "P" 's truck had been vandalized and that
someone sprayed paint on it. Ms. "FF" called respondent on the telephone and asked if he was
responsible for the vandalism and respondent stated that he was not. That call was at
approximately 4 a.m. Thereafter, respondent heard pounding on his door and refused to open
it. Rather, he called the local police and they responded by coming to the premises. Later that
month and on November 30, 2002, Mackenzie reported to respondent that he had been
"slammed" into a door by Jerry "P" for putting his boots on the wrong way. Respondent
[*4]
reported this to the local police authorities and a police officer interviewed Mackenzie.
Notably, on December 3, 2002 respondent again applied to Supreme Court to modify the
custodial provisions of the Judgment of Divorce. He sought increased custodial time with
Mackenzie and an Order of Protection directing Lisa "FF" not to permit Jerry "P" to
inflict corporal punishment on the child. Interestingly, he also sought access to Lisa "FF" 's
apartment in order to effect repairs, etc... Unknown to respondent, on December 2nd, Lisa "FF"
had removed herself, Jerry "P" and the child from the apartment and relocated to a new
residence. Subsequently on January 15, 2003, the pending motion was resolved in Supreme
Court, upon the stipulation of the parties, their attorneys and the law guardian. What resulted
was, in effect, a split/joint custodial arrangement whereby Mr. "FF" would have Mackenzie on Tuesdays from 7 a.m. through Thursday at 6 p.m. every other week and on alternating weeks he would have Mackenzie from Thursday at 7:30 a.m. through Sunday at 6 p.m. Additionally, Jerry "P" consented to a decretal paragraph ordering that he not inflict corporal punishment on Mackenzie. The very next day while at respondent's home, Mackenzie reported to his father that Jerry "P" had put soap in the child's mouth as a form of punishment. Mr. "FF" reported that incident to Attorney Frederick Partyka, the law guardian for the child.
Barely a month and one-half later on March 3, 2003, the Department of Social Services received a hotline report, through the New York State Central Registry, alleging that Robert "FF" had fondled Mackenzie's buttocks and genitals and that Robert "FF" had forced Mackenzie to touch his father's penis. That same day, an investigator from the New York State Police visited Mr. "FF" at his home and told him that he was being investigated for sexually abusing his son. Mr. "FF" denied sexually abusing his son and has consistently maintained his innocence up to and including the trial before this Court. Based upon the allegations made to the Department of Social Services, an Application for Judicial Action was filed with this Court on March 5, 2003 and as a result thereof, a Temporary Order of Protection was issued on said date directing ROBERT "FF"to have no contact with his child at all. Then on March 14, 2003, the Department of Social Services filed a petition against ROBERT "FF"alleging four causes of action consisting of abuse, neglect, severe abuse, and repeated abuse. All incidents were alleged to have occurred between September 2002 and February 2003, at the father's home at 24 East Main St., St. Johnsville, New York. They were "fondling said child's buttocks", "kissing said child's buttocks", "fondling said child's genitals" and "forcing said child to fondle respondent's genitals". The source of the accusations was allegedly the child who related same to his mother.
In an effort to "validate" the statements of the child, Department of Social Services hired David Horenstein, PhD., a licensed psychologist in New York State, to evaluate Mackenzie. On [*5]May 14, 2003, Dr. Horenstein evaluated the respondent with respondent's consent and found no pathology. On May 19, 2003, Dr. Horenstein evaluated Mackenzie. Dr. Horenstein filed a written report with the Department of Social Services. However; same was not received in evidence at the trial due to the sustained objection made by the Department of Social Services. It is clear to the Court, from the letter that it received dated June 19, 2003from the Department of Social Services, that Dr. Horenstein was unable to validate the child's statements and hence the petition was withdrawn and the Temporary Order of Protection terminated. Consequently, over four months elapsed without the father having unsupervised contact with his son. It was not until June 26, 2003, that Mr. "FF" resumed custodial time with Mackenzie. Respondent opined that his son looked "boney" and he took him to a doctor for an examination as he was concerned about the child's loss of weight and physical appearance. On July 3rd, Mr. "FF" took his son to a doctor again for further examination. Between July 3rd and July 18th, the Department of Social Services investigated Lisa "FF"as a result of a complaint received that the child was not thriving. That complaint was unfounded.
On July 18, 2003, Lisa "FF"claims that Mackenzie told her that respondent had put his penis in Mackenzie's mouth and that respondent had placed his mouth on Mackenzie's penis. She also stated that Mackenzie claimed that Mr. "FF" had kissed the child on his mouth. The mother further testified that earlier in 2003, Mackenzie had informed his mother that Mr. "FF" had touched Mackenzie's penis and put a finger in his anus. Lisa "FF"reported these disclosures to Department of Social Services and also told caseworkers that Mackenzie had been examined by a doctor earlier in the day and that Mackenzie had made disclosures to the doctor. Ms. "FF" further stated that DSS caseworker Weaver had requested that Ms. "FF" take Mackenzie to a doctor after the child's last visit with his father. It is significant to the Court that the doctor was not named nor produced by petitioner and hence we have a missing witness that could have provided essential information to investigators, evaluators and the Court.
A senior caseworker, Amy Houghton, interviewed Mackenzie and during the introductory stage, Lisa "FF", Jerry "P" and another caseworker named Heide were present. The caseworkers commenced the interview in a conference room, in the presence of Lisa "FF"but not Jerry "P". Among other things, Mackenzie initially stated that he liked to visit his daddy and had fun at his daddy's. Caseworker Houghton testified, and her notes reflect, that at this stage of the interview Lisa "FF"was escorted out of the room so that the caseworkers could continue their interview with just Mackenzie present. That version of events conflicts with the mother's testimony which stated that she was not asked to leave the conference room until after the child had told Ms. Houghton that Mr. "FF" had the child's penis in his mouth and that Mr. "FF" had inserted his finger in the anus of Mackenzie. A video and/or an audio recording of the interview would have aided all concerned including the Court and more will be said about that absence of proof hereafter.
After explaining to Mackenzie what good/bad and secret touch are and explaining that "secret touch is when someone touches you where you go poopie or peepee and sometimes they want you to keep it a secret", Mackenzie was asked pointendly if anyone had ever done a secret touch to him and he shook his head no. (cf. Respondent's exhibit G)
At this point in the interview, Ms. Houghton showed Mackenzie three drawings (Petitioner's exhibit 4) consisting on an anterior view of a nude male child and anterior view of [*6]an nude adult male and the posterior view of a nude male child. A number of leading questions ensued, including inquiries as to whether respondent touches Mackenzie's penis, to which the child responded "yes" and whether respondent touches his own penis to which Mackenzie responded "yes". When the child was asked by Ms. Houghton what daddy did with Mackenzie's penis and what he did with his own, the child rubbed his hand up and down his zipper area very fast. He also stated that his father touched both of their penis' at the same time, when asked that direct question. When asked if he ever touched dad's penis, he responded "no". When questioned as to whether daddy's mouth has ever touched Mackenzie's body, the child responded "yes" and when asked where, Mackenzie said "he bites my penis". Notably, when queried as to whether his daddy asks him to put his mouth on daddy's penis, he said "no". Utilizing the drawings, Ms. Houghton asked Mackenzie if daddy's penis ever touched anywhere else on his body and Mackenzie pointed to the belly and belly button. When shown the picture representing the posterior view of the nude youth, Mackenzie was asked if daddy's penis ever touched his body on the back of him. He nodded and pointed to the "hiney". Although the caseworker had been asking the child about where the father's penis had touched the child on his hiney, when the caseworker asked "what part of daddy touches where...his poop comes out? He said, "hands". This activity allegedly occurred on "daddy's couch". That incident occurred allegedly during the father's last visit with Mackenzie.
By way of recapitulation, Mackenzie made disclosures to various individuals, at at least three separate locations, on July 18th. Lisa "FF"'s account is substantially different from that of Amy Houghton and we have no way of knowing what disclosures were made to the unnamed doctor. However, the doctor, as a mandated reporter, was compelled to report to the Department of Social Services and yet there is no indication, from the evidence received, that that ever occurred.
Later in the day on July 18th, the child was transported to Ellis Hospital where Barbara Salisburg, a registered nurse trained in sexual assault, conducted a physical examination. When interviewed at Ellis Hospital, Mackenzie offered no disclosures. Lisa "FF"stated to Nurse Salisburg that on the previous day Mackenzie told her that "daddy put the middle finger of his hand on his butt" also that "daddy put his penis in his mouth". (cf Petitioner's exhibit 2) A rectal exam revealed no abnormalities, with the exception of an area of discoloration noted at 6 o'clock. When the child was re-examined at Ellis Hospital on August 11, 2003, the discoloration was no longer present. Nurse Salisburg testified that the discoloration could have occurred from digital contact including "forcible wiping".
On July 23, 2003 New York State Bureau of Criminal Investigation, acting through Investigator Israel Toro, informed Robert "FF", at his home, that once again allegations of sex abuse had been made against him. Based upon a statement obtained from Lisa "FF", a search warrant was obtained and on July 23rd was executed at Mr. "FF"'s home, without objection by Mr. "FF". Articles of clothing including the child's pajamas, tee shirt, shorts and underpants were confiscated and sent to a laboratory for forensic evaluation. No incriminating evidence was found and Investigator Toro opined that there was insufficient proof to process any criminal charges against the respondent. Once again, a potentially crucial piece of evidence is not available for Court review. No one produced the statement that Lisa "FF"gave to the BCI which resulted in the search warrant, since she had already made inconsistent statements as to what was [*7]related to her by the child to Amy Houghton and Nurse Salisburg on July 18th. It would be very interesting to know what she claimed the child disclosed, when she was speaking to the BCI investigator and perhaps to the doctor that she had taken the child to earlier in the day on July 18th.
Another question arises with regard to the mother's testimony at trial. She stated that in February 2003, she observed Mackenzie wiping his "poop" on the wall of the bathroom. She claims that the child reported to her that Mr. "FF" sticks his finger in the child's hiney after wiping him to see if all the poop is out. She further testified that the child was crying at the time and she made him clean up the mess. It is notable that no such allegation is contained in the earlier request for judicial action and abuse petition filed by Department of Social Services which covered alleged incidences from September 2002 through February 2003.
The inconsistences and confusion increase upon reviewing the testimony and report of Dr. Hamill and the testimony of Dr. Horenstein.
As previously stated, Dr. Horenstein was hired by petitioner to "validate" Mackenzie's disclosure of alleged sexual abuse. Mr. "FF" volunteered to be evaluated claiming he had "nothing to hide". Although Dr. Horenstein met with Lisa "FF", he did not evaluate her. The evaluation of Mackenzie was conducted utilizing the "Step-Wise Protocol" or methodology similar to it.
In the evaluation of Mackenzie, occurring on May 19, 2003, Dr. Horenstein concluded that the child's statements could not be validated. According to Dr. Horenstein, Mackenzie was inconsistent and didn't know what truth meant. Furthermore, Mackenzie stated that he wanted to see his father, he was not frightened of his father, his father had not hurt him and he didn't know why he wasn't seeing his father. Although Mackenzie claimed that his mother didn't spank him, Lisa "FF"admitted that she did. Mackenzie also told Dr. Horenstein that his mother and Jerry "P" put soap in his mouth. Mackenzie did state that ROBERT "FF"had touched Mackenzie's penis and rectum.
Dr. Horenstein opined that contextual details lead to more validity and there were none here. He also stated that empirical data suggests that when custody battles are ongoing, there is an increase of false allegations of sexual abuse and that such false allegations occur between 30 to 60 percent of the time. As Dr. Horenstein stated "it's an extremely effective tool to keep a parent away from a child."
When inquiry was made as to the susceptibility of younger children to suggestibility, Dr. Horenstein claimed that the younger the child, the more susceptible the child is to suggestions and even more so if the child is passive, timid and/or coddled.
Dr. Horenstein found it to be significant that Mackenzie made further and different disclosures of alleged sexual abuse by his father when evaluated by Dr. Hamill in September 2003. He concluded that the child could have been coached or had matured enough to recall events that were not disclosed in May.
Richard Hamill, Ph. D. is also a New York State certified psychologist who was retained by the Department of Social Services to evaluate Mackenzie. That evaluation took place on September 18, 2003 and Dr. Hamill's report was received in evidence as petitioner's exhibit 3. Dr. Hamill also testified at trial.
Dr. Hamill stated that the evaluation was conducted according to the Step-Wise interview [*8]protocol developed by Prof. John Yuille.
During the introductory stage of the evaluation, Mackenzie stated that he celebrated his last birthday (August 16, 2003) at his dads and had ice cream with nuts. After further discussion with Mackenzie about gifts received for his recent birthday, Dr. Hamill concludes "his ability to recall and talk about events appeared to be above average for a child of his age" (exhibit 3, p. 2) This is remarkable in that Mackenzie was not at his father's home for his birthday nor did he have ice cream and nuts there. On July 23, 2003, this Court issued a stay-away Temporary Order of Protection prohibiting any contact between Mackenzie and his father.
Incredibly, Dr. Hamill stated on page 6 of his report: "Following the interview, the evaluators examined the account of sexual abuse which Senior Caseworker Houghton gathered from MACKENZIE "FF"on 7/21/03(sic). That account was highly consistent with the information provided by Mackenzie during the current evaluation. There were no significant discrepancies, which supports the finding that this account has been highly consistent over time. ..." A close examination of the Houghton report and the Hamill report discloses significant discrepancies. For example, Mackenzie tells Houghton that when daddy touches his penis with his hand he rubbed it up and down very fast and that his daddy touches his own penis and rubs it in the same way and that daddy touches both of their penis' at the same time. He also told Houghton that daddy's penis touched him on his belly and his belly button. When asked by Houghton if daddy's penis ever touched his hiney, the child nodded and stated that he was on his father's lap. When asked by Houghton if daddy put his penis on his hiney or inside where the poopie comes out, Mackenzie said "on my hiney". Allegedly, all that occurred the last time that Mackenzie saw his father which would have been a matter of hours or days prior to the interview on July 18, 2003. That scenario contrasts sharply with the information given to Dr. Hamill just two months later. For the first time, Mackenzie alleges that his father had anal intercourse with him and that "when he puts it in, I hold on too tight it feels bad". When asked about the season when this occurred, Mackenzie told Dr. Hamill that it was during the winter when there was snow on the ground. The child claimed that the anal penetration by the father's penis occurred more than once. Mackenzie denied that his dad touched his penis to any other parts of Mackenzie's body. Mackenzie also told Dr. Hamill that respondent had touched his penis to Mackenzie's penis.
About the only thing that was consistent between the disclosures made to Senior Caseworker Houghton and Dr. Hamill was that respondent touched the child's penis and hiney and as the child said "bitted my penis". Dr. Hamill agreed with Dr. Horenstein that Mackenzie was unable to define the difference between the truth and a lie. In fact, during the one hour interview with Dr. Hamill, Mackenzie stated that he had seen a white mouse in his bed and that it was real and conversely that it was "pretend".
Since both Dr. Hamill and Dr. Horenstein subscribe to the Step-Wise Interview protocol, it is important to ascertain whether they, or any other interviewer, followed said protocol. The Court finds that no one did. Respondent's exhibits C, D and E all refer to the Step-Wise Interview process developed by John C. Yuille. Although it is most enlightening to set forth the contents of all three exhibits, the Court will set forth succinctly what it deems critical in leading the Court to the conclusion that all interviews were conducted improperly.
"The core of the Step-Wise Interview is the organization of
[*9]
the steps of the interview to maximize recall while minimizing
contamination. The term "Step-Wise" refers to the use of a set
of steps during the interview. These steps begin with the most
open, least leading form of questioning and proceed to more
specific forms of questioning as circumstances require. The
initial goal is to give the child every opportunity to provide a
free narrative before other forms of questioning are used. The
next step is to use open, general questions to prompt more recall
without leading the child in any way. Following this, the child
is prompted for more specific recall,but only by requesting an
elaboration of details already described or introduced in the
child's earlier free narrative report." (Respondent's exhibit D p. 99)
Professor Yuille, as a prerequisite to the commencement of any interview with a child, insists that the interview be videotaped and in the absence of video equipment, audio taped and if no electronic equipment is available, a verbatim record must be kept (presumably by a stenographer or a shorthand reporter). (Respondent's exhibit D pgs. 100 &101; Respondent's exhibit C pgs. 4 & 5) Although it should be obvious to any intelligent person as to why such an interview should be videotaped, Professor Yuille cogently sets forth seven reasons for doing so. (Respondent's exhibit D, p. 101) It is also common knowledge that the cost of recording equipment is little and therefore it is inexcusable that same was not utilized. Without the benefit of those recordings and considering the testimony of Senior Caseworker Houghton and Dr. Hamill along with their reports, the Court finds that the questioning of Mackenzie was very leading, suggestive and not adherent to the Step-Wise protocol. As Professor Yuille points out, "poor interview procedures also can lead to false allegations" and further "a false allegation can also occur without the deliberate complicity of the child. For example, a parent caught up in a custody dispute could deliberately generate a false allegation of abuse that a child might come to believe. Alternatively, both parent and child may make an allegation of abuse based on their misinterpretation of some behavior of the other parent. For example, the custodial parent might learn that during a visit, the other parent had touched the daughter's genital area while bathing her. Although the touching was for hygienic reasons, the custodial parent interprets it as sexual in nature. Over time, both the custodial parent and the child come to believe this misinterpretation and in the context of a custody/visitation dispute, use this "evidence" against the other parent." (Respondent's exhibit D, p. 97)
The Court also received the testimony of Steven Ortiz, a certified polygraph examiner with the New York State Police. Officer Ortiz testified that polygraph exams are used widely throughout the country as an investigative tool to determine if a person is deceptive or truthful and also to determine whether criminal charges should be pressed. The test cannot be administered without the consent of the individual being tested and in this case ROBERT "FF"requested the test. After following the accepted protocol employed by polygraph examiners, the test was administered and among the questions put to Mr. "FF" were those pertaining to the allegations of his alleged sexual abuse of his son. Officer Ortiz opined that the test results indicated that respondent was being truthful when he denied sexually abusing his son.
[*10]
The Court also finds it material that a petition to modify custody is scheduled for trial before this Court on April 1, 2004. A petition by Lisa "FF"was filed September 10, 2003 and seeks sole custody of Mackenzie with no visitation to Mr. "FF". She alleges that as a change in circumstance "sexual abuse from respondent to child (Mackenzie)".
It is also meaningful that both parents expressed concern about the low body weight of Mackenzie. Lisa "FF"testified to behavior that should concern any parent. She claimed that Mackenzie, among other things, was withdrawn, depressed, had temper tantrums, bites his lip until it bleeds, regurgitates his food and eats it again. She claimed that Mackenzie "freaks out" and has thrown his food while eating in a car at a McDonald's. She further stated that he doesn't sleep well and doesn't want to be in bed. As a result of the child's disclosures to her and behaviors she has observed, the mother has taken the child to a psychologist named Beverly Lawson with visits commencing in November 2003. Dr. Lawson was not produced as a witness and therefore the Court is not aware of whether any disclosures were made to that psychologist. Lisa "FF" testified that disclosures of sex abuse were made by Mackenzie to Jerry "P". However, he was not produced either.
The Court finds that the relationship between Lisa "FF"and ROBERT "FF"was not a warm loving one even when they lived together. Lisa "FF"testified that they rarely had sexual relations and that she had to get him drunk in order to engage in the sexual intercourse resulting in the conception of Mackenzie. She also publicly accused him of being gay.
THE LAW
Family Court Act, Section 1046(a) (vi) provides that in any hearing under Article 10:

"Previous statements made by the child relating to any allegations of abuse or neglect shall be admissible in evidence, but if uncorroborated, such statements shall not be sufficient to make a fact-finding of abuse or neglect. Any other evidence tending to support the reliability of the previous statements, including, but not limited to the types of evidence defined in this subdivision shall be sufficient corroboration. The testimony of the child shall not be necessary to make a fact-finding of abuse or neglect."
Family Court Act, Section 1046 further provides that Family Court child protective proceedings are civil in nature and a finding of abuse or neglect need only be supported by a preponderance of the evidence.
Corroboration is not required because statements of children are generally unreliable, but because the out-of-court statements are hearsay and the statute requires some further evidence to establish their reliability. Matter of Nicole V., 71 N.Y.2d 112, citing Matter of Lydia K., 112 AD 2d 306, aff'd 67 N.Y. 2d 681. It was also noted by the Court that corroboration of a child's out-of-court statement is not required if the statement is admissible under an exception to the hearsay rule.
The Court of Appeals' remarks in 1987 are as applicable today as they were then, when the Court stated:
"In recent years preventing the sexual abuse of children in family settings has
 become a major social and judicial concern... Such abuse is difficult to detect
[*11] because the acts are predominantly non-violent and usually occur in secret,
 rendering the child the only witness. Moreover, once abuse is uncovered it is
 difficult to fix blame, not only because of the lack of evidence but also because
 of the reluctance or inability of victims to testify."
The Family Court is vested with broad discretion to determine, in the first instance, whether a particular child's statements have been sufficiently corroborated. Matter of Russell B. 257 AD 3d 707 (Third Dept., 1999); Matter of Tracy v. Donald, 220 AD 2d 888 (Third Dept., 1995). There is, however, a threshold of reliability that the evidence must meet; Matter of Zachariah V.V., [Ricky V.V.] 262, AD 2d 719 (Third Dept., 1999); leave to appeal denied, 94 N.Y. 2d 756 and Matter of Heidi "CC", 270, AD 2d 528 (Third Dept., 2000).
In Matter of Nicole V., supra, reading the requirement of corroboration contained in Family Court Act 1046(a)(vi), the Court of Appeals noted: "The natural meaning of that language is that repetition of an accusation by a child does not corroborate the child's prior account of it."
Furthermore, the Nicole V. Court stated, "...Expert opinions are admissible on subjects involving professional or scientific knowledge or skill not within the range of ordinary training or intelligence... The psychological and behavioral characteristics and reactions typically shared by victims of abuse in a familial setting are not generally known by the average person..."
Hence, so-called "validation" testimony by psychiatrists and psychologists has routinely been accepted as a suitable form of corroboration. However, the term "validation" or "validator" may be misnomers because the purpose of the validation evaluation by an expert is not to determine whether the child is telling the truth or that the respondent sexually abused the child, but rather to obtain an opinion as to whether the child's behavior was symptomatic of a sexually abused child; Matter of Nicole V., supra.
In Matter of Eli v. Eli, 159 Misc. 2d 974 (1993), the Family Court, New York County, described at length, the purpose and the limitations of so-called "validation" testimony:
"The most common type of expert testimony received in child sexual abuse
 cases is what is known as validation testimony. That term, although now
 generally accepted, is misleading. The "validator" validates nothing.
 Validation testimony is no more than expert psychological evidence of
 a child's mental illness or unusual behavioral manifestation, which would
 be consistent with sexual abuse. It would be far more accurate for the Court's
 purposes to refer to these witnesses as corroborators rather than validators,
 because the latter term implies approval of the genuineness of the child's
 claim, not merely recognition of consistency with a certain behavioral
 pattern.
While, in a treatment context, a validator is required to make a
 determination whether he or she believes the allegations, the determination
 is made based upon objective observations measured against concrete guide-
 lines; the purpose of the validation process is to aid in clinical decisions for
 the purpose of intervention and therapy. The validator as witness does not
 give a personal opinion as to whether the abuse occurred. This witness
[*12] relates the behavioral indicators observed in the child to those recognized
 as displayed by children who have been sexually abused. It is for the judge
 to decide whether the abuse occurred."
In Matter of Kelly F., 206 AD 2d 229, (Third Dept. 1994), the Court held that an expert witness whose testimony consisted essentially of vouching for the credibility of the child failed to provide sufficient corroboration of the child's out-of-court statements to comply with the requirements of Section 1046(a)(vi) of the Family Court Act. The expert should not be permitted to testify as to whether he or she believes that the child is telling the truth. Matter of Sanchez, 141 Misc. 2d 1066 (1988).
"Sexual contact" means any touching of the sexual or other intimate parts of a person not married to the actor for the purpose of gratifying sexual desire of either party. It includes the touching of the actor by the victim, as well as the touching of the victim by the actor, whether directly or through clothing." Section 130.00(3) Penal Law.
A person is guilty of forcible touching when such person intentionally, and for no legitimate purpose, forcibly touches the sexual or other intimate parts of another person for the purpose of degrading or abusing such person; or for the purpose of gratifying the actors sexual desire. Whether or not specifically stated, it is an element of every offense defined in this article that the sexual act was committed without consent of the victim.
A person is deemed incapable of consent when he or she is: (a) less than 17 years old. Section 130.05(1)(3a) Penal Law.
For the purposes of this section, forcible touching includes squeezing, grabbing or pinching. Section 130.52 Penal Law.
A person is guilty of sexual abuse in the 3rd degree when he or she subjects another person to sexual contact without the latter's consent...Section 130.55 Penal Law.
CONCLUSIONS
Upon the Findings of Facts contained herein and applying the law to those facts, the Court concludes that the petitioner has failed to sustain its burden with regard to any of the causes of action set forth in its petition. Mackenzie's accusations of sexual abuse by his father are not consistent and could not be corroborated reliably by anyone. As stated earlier, much needed information was not produced and since no explanation was offered by petitioner as to why it was not, the Court concludes that it could have been; and that a negative inference against petitioner is warranted.
In light of the continuing animosity between the parents, as evidenced by numerous court proceedings, subsequent to their divorce, including a pending petition praying for modification of custody that is presently scheduled for trial, the likelihood of a false accusation is high. That does not necessarily mean that Lisa "FF" has inculcated in the child suggestions of sexual abuse by his father. It is just as likely that the accusations arose as a result of misunderstandings between Mackenzie and his mother, along the lines suggested by Professor Yuille as quoted herein.
Odious charges, such as those contained in the petition before the Court, should not be lodged without proper and thorough investigation beforehand due to the dire consequences involved. Such charges, even if found to be dismissed for failure of proof, are likely to leave an indelible stain on the reputation of the respondent. Likewise, inexplicable harm may be visited [*13]on a child by a perpetrator of sexual abuse who has been exonerated as a result of poor case preparation.
The Department of Social Services is notified that, in the future, interviews with children alleging sexual abuse must be videotaped in order to be accorded credibility by this Court.
In light of the foregoing, the petition is dismissed and the Temporary Order of Protection issued in conjunction therewith is hereby vacated.
This constitutes the Decision and Order of the Court.
Dated: March 9, 2004
S/ DAVID F. JUNG 

Hon. David F. Jung
Family Court Judge
Decision Date: March 09, 2004